**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------ X

LUV N' CARE, LTD. and ADMAR
INTERNATIONAL, INC.,

                  **Plaintiffs,**

          **- against -**

MAYBORN USA, INC.,

                  **Defendant.**

------------------------------------------------ X

**OPINION AND ORDER**

11 Civ. 2460

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

Luv n' Care, Ltd. and Admar International, Inc. (collectively, "LNC")
bring this infringement action against Mayborn USA, Inc. ("Mayborn").  LNC
alleges that its no-spill drinking cup design patent and corresponding trade dress
are infringed by Mayborn's Tommee Tippee ("TT") Sippy Cup, and also claims
unfair competition under New York state law.  Mayborn now moves for summary
judgment.  For the reasons set forth below, summary judgment is denied.

## II.  BACKGROUND

LNC sells sippy cups for children in the United States and

1

internationally under the NUBY brand name.[1]  Admar International, Inc. owns Luv

n' Care and the interest in its trademarks and trade dress.[2]  In this action, LNC is

alleging infringement of its D634,439 design patent ("the '439 patent"),[3] which

claims "the ornamental design of a drinking cup top" and contains five drawing

sheets.[4]  Mayborn distributes the accused cup,[5] which has a star around the air

valve and ridges around the spout.[6]  The '439 patent  has no star and no ridges.[7]

Both the '439 patent's  and TT cup's lids are transparent.[8]

---

[1]     *See* 3/20/12 Declaration of Nouri E. Hakim, Chief Executive Officer of LNC, in Opposition to Summary Judgment ("Hakim Decl.") ¶¶ 3–4.

[2]     *See* Complaint ¶ 15.

[3]     *See* Plaintiffs' Memorandum of Law in Opposition to Motion for Summary Judgment ("Pl. Mem.") at 5.

[4]     *See* 3/15/11 Patent No. U.S. D634,439 ("the '439 Patent"), Ex. 1 to 2/27/12 Declaration of Deepro Mukerjee, defendant's counsel, in Support of Summary Judgement ("Mukerjee Decl.") at 2.

[5]     *See* Defendant's Memorandum of Law in Support of Summary Judgment ("Def. Mem.") at 1.

[6]     *See* Defendant's Statement of Uncontested Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1") ¶¶ 55–58.  LNC disputes that the star design is a signature of TT products and that the ridges are prominent on the TT spout.  *See* Plaintiffs' Response to Defendant's Statement of Uncontested Material Facts Pursuant to Local Rule 56.1(a) ("Pl. 56.1") ¶¶ 55–58.

[7]     *See* Def. 56.1 ¶¶ 118–119.

[8]     *See* Cooper C. Woodring's Design Patent and Trade Dress Infringement Reports ("Woodring Reports"), Ex. 1 to 3/20/12 Declaration of

The '439 patent is a continuation of an earlier design patent, D617,465 ("the '465 patent"),[9] which is a continuation of a utility patent, 10/536,106 ("the '106 application"),[10] which is currently pending.[11]  However, the '439 patent claims priority directly from the '106 application.[12]  The '106 application describes the entirety of a drinking cup.[13]  Mayborn asserts that the "claims of the '106 application generally describe two embodiments, each that employ a no-spill valve."[14]  LNC, however, disputes this statement and asserts that "the claims in their present form are directed to a variety of features of no-spill drinking products."[15]  The inventor of the '106 application testified that the cup top

---

Benjamin H. Graf, plaintiffs' counsel, in Opposition to Summary Judgment ("Graf Decl.") at 10–14.

[9]      *See* 6/8/10 Patent No. U.S. D617,465 S ("the '465 Patent"), Ex. 2 to Mukerjee Decl., at 2.

[10]     *See* Patent '439 at 2; 9/27/07 Patent Application No. 10/536,106 ("the '106 Application"), Ex. 3 to Mukerjee Decl., at 2.

[11]     *See* Pl. 56.1 ¶ 7.

[12]     *See* File Wrapper of the '439 Patent ("File Wrapper"), Ex. 5 to Graf Decl., at 1.

[13]     *See* the '106 Application at 2.

[14]     *See* Def. 56.1 ¶ 8.

[15]     Pl. 56.1 ¶ 8.

could be designed in myriad ways without sacrificing functional viability.[16]

Both parties cite numerous examples of prior art. Mayborn cites to U.S. Patent Numbers 6,102,245 ("the '245 patent"),[17] D457,778,[18] D460,322,[19] 6,321,931 ("the '931 patent"),[20] D387,247,[21] 5,988,425,[22] and U.S. Patent Application Number WO 03/101261.[23]   LNC cites over twenty-five examples of prior art:  D421,878, D364,314, D551,904, D476,850, D495,558, 5,079,013, 6,705,485, D310,567, D327,818, D364,316, D479,946, D419,029, D385,748, D327,393, D315,213, D452,415, D364,315, D559,662, D429,443, D434,944, D415, 654, 4,946,062, D579,722, D387,621, 6,230,923, D450,535, WO

---

[16]     *See* 2/16/12 Deposition of Eddie Hakim (Nouri E. Hakim), Inventor of the '439 and '225 patents ("Hakim Dep."), Ex. 15 to Mukerjee Decl., at 151–153.

[17]     *See* 8/15/00 Patent No. U.S. 6,102,245, Ex. 6 to Mukerjee Decl., at 2.

[18]     *See* 5/28/02 Patent No. U.S. D457,778 S, Ex. 7 to Mukerjee Decl., at 2.

[19]     *See* 7/16/02 Patent No. U.S. D460,322 S, Ex. 8 to Mukerjee Decl., at 2.

[20]     *See* 11/27/01 Patent No. U.S. 6,321,931 B1, Ex. 10 to Mukerjee Decl., at 2.

[21]     *See* 12/9/97 Patent No. Des. 387,247, Ex. 13 to Mukerjee Decl., at 2.

[22]     *See* Defendant's Reply Memorandum of Law in Further Support of Summary Judgment ("Reply Mem.") at 3.

[23]     *See* 6/6/02 Patent Pub. No. US 2002/0066741 A1, Ex. 11 to Mukerjee Decl., at 2.

03/070150, and US 2002/0066741 A1.[24]   The report of Cooper C. Woodring,

plaintiffs' expert, identifies Japanese Patent Number D2000-37405 ("JP 129061")

as the prior art design most similar to the '439 patent and the TT cup.[25]

LNC alleges trade dress infringement of its soft-top.[26]   Mayborn

alleges that the entirety of the soft-top design is claimed by utility patent U.S.

6,994,225 B2 ("the '225 patent").[27]   The '225 patent is not in the direct priority

chain of the '439 patent.[28]   By 2006, "other companies were selling soft top cups

with the very same features that LNC alleges are protectable trade dress."[29]   LNC's

soft-top was involved in another trade dress infringement action, *Luv n' Care, Ltd.*

*v. Walgreen Co.*[30]   LNC also asserted the '439 patent in *Luv n' Care, Ltd. v. Regent*

---

[24]     *See* Sippy Cup Patents, Ex. 3 to Graf  Decl., at 4–12.

[25]     *See* Woodring Reports at 11.

[26]     See Pl. Mem. at 11.

[27]     *See* Def. Mem. at 23; 2/7/06 Patent No. U.S. 6,994,225 ("the '225 Patent"), Ex. 4 to Graf Decl., at 1.

[28]     *See* Pl. 56.1 ¶ 16.

[29]     Def. 56.1 ¶ 117.  LNC admits this fact.  *See* Pl. 56.1 ¶ 117.

[30]     *See* 695 F. Supp. 2d 125 (S.D.N.Y. 2010) (finding, inter alia, that material fact issues pertaining to secondary meaning, likelihood of confusion, and functionality precluded summary judgment on trade dress infringement).

*Baby Products Corp.*[31]

LNC's soft-top products have achieved significant sales success and consumer popularity.[32]  LNC sold 54,515,386 cups in the United States from 2004-2007.[33]  LNC has received awards from Wal-Mart Stores, Inc. ("Walmart")[34] and unsolicited online consumer accolades.[35]  LNC has benefitted from its own extensive advertising efforts as well as publicity provided by retailers such as Walmart.[36]

## III.   PROCEDURAL HISTORY

The Complaint in this case was filed on April 11, 2011.[37]  LNC originally claimed: (1) design patent infringement under section 271 of Title 35 of the United States Code; (2) Lanham Act trade dress infringement and unfair competition under section 1125(a) of Title 15 of the United States Code; (3) unfair

---

[31]     *See* —  F. Supp. 2d — , No. 10 Civ. 9492, 2012 WL 78042 (S.D.N.Y. Jan. 11, 2012) (holding, inter alia, that LNC failed to state a claim for trademark dilution under federal law).

[32]     *See* Hakim Decl. ¶ 7.

[33]     *See id.* ¶ 8.

[34]     *See id.* ¶ 11.

[35]     *See id.* ¶¶ 15–17.

[36]     *See id.* ¶¶ 18–21.

[37]     *See* Complaint at 1.

competition under New York common law; and (4) trademark dilution under New York General Business Law section 360-1.[38]

On February 27, 2012, Mayborn moved for Summary Judgment on all claims.[39]  However, LNC withdrew the New York trademark dilution claim in its opposition brief.[40]  I now consider the motion for summary judgment on the remaining claims.

## IV.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  "'A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor.'"[41]  "'A fact is material when it might affect the outcome of the suit under governing law.'"[42]

---

[38]      *See id.* ¶¶ 33–61.

[39]      *See* Def. Mem. at 35.

[40]      *See* Pl. Mem. at 35.

[41]      *United Transp. Union v. National R.R. Passenger*, 588 F.3d 805, 809 (2d Cir. 2009) (citations omitted) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).

[42]      *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 94 (2d Cir. 2012) (quoting *Bessemer Trust Co. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010)).

In a summary judgment setting, "the moving party bears the burden of showing that he or she is entitled to summary judgment."[43]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence . . . on an essential element of the nonmovant's claim."[44]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  The non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[45] and cannot "'rely on conclusory allegations or unsubstantiated speculation.'"[46]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[47]  However,

---

[43]     *United Transp. Union*, 588 F.3d at 809 (citing *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005)).

[44]     *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[45]     *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[46]     *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[47]     *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

"'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[48] "'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[49]

## V.    APPLICABLE LAW

### A.    Design Patent Infringement

"Determining whether a design patent is infringed requires (1) construction of the patent claim, and (2) comparison of the construed claim to the accused product."[50]  In construing a design patent, "it may be unwise to attempt a full description of the claimed design, [but] a court may find it helpful to point out, either for a jury or in the case of a bench trial by way of describing the court's own analysis, various features of the claimed design as they relate to the accused design and the prior art."[51]  "Design patents are typically claimed as shown in drawings,

---

[48]    *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[49]    *Brod*, 653 F.3d at 164 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

[50]    *Colida v. Sharp Elecs. Corp.*, 125 Fed. App'x 993, 994 (Fed. Cir. 2005).

[51]    *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 680 (Fed. Cir. 2008).

and claim construction must be adapted to a pictorial setting."[52]

A fact-finder applies the "ordinary observer" test in determining whether a design patent has been infringed:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.[53]

In its *en banc* decision in *Egyptian Goddess, Inc. v. Swisa, Inc.*, the Federal Circuit rejected the "points of novelty" test, holding that the ordinary observer test is the "sole test for determining whether a design patent has been infringed."[54]  In its present formulation, the test asks if "an ordinary observer, familiar with the prior art designs, would be deceived into believing that the accused product is the same as the patented design."[55]

The Federal Circuit detailed the ordinary observer analysis in *Crocs, Inc. v. International Trade Commission*:

---

[52]     *Crocs, Inc. v. International Trade Comm'n*, 598 F.3d 1294, 1302 (Fed. Cir. 2010) (citation omitted).

[53]     *Gorham Mfg. Co. v. White*, 81 U.S. 511, 528 (1872).

[54]     543 F.3d at 678.

[55]     *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1295 (Fed. Cir. 2010) (citing *Egyptian Goddess*, 543 F.3d at 681).

> When the differences between the claimed and accused designs are viewed in light of the prior art, the attention of the hypothetical ordinary observer may be drawn to those aspects of the claimed design that differ from the prior art. If the claimed design is close to the prior art designs, small differences between the accused design and the claimed design assume more importance to the eye of the hypothetical ordinary observer. The ordinary observer, however, will likely attach importance to those differences depending on the overall effect of those differences on the design. Even if the claimed design simply combines old features in the prior art, it may still create an overall appearance deceptively similar to the accused design. In that case, this court will uphold a finding of infringement.[56]

The ordinary observer test applies to patents that have both design and functional elements.[57] "If a design includes both functional and ornamental features, infringement occurs if an ordinary person 'would be deceived by reason of the common features in the claimed and accused designs which are ornamental.'"[58] "In addition, the accused design must appropriate the novel ornamental features of the patented design that distinguish it from the prior art."[59] While it is appropriate to factor out the functional elements of a design patent in claim construction, that

---

[56]    598 F.3d at 1303 (citing *Egyptian Goddess*, 543 F.3d at 681).

[57]    *See Richardson*, 597 F.3d at 1295 (citing *Amini Innovation Corp. v. Anthony Cal., Inc.*, 439 F.3d 1365, 1372 (Fed. Cir. 2006)).

[58]    *Amini*, 439 F.3d at 1371 (quoting *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 825 (Fed. Cir. 1992)).

[59]    *See id.* (citing *Oakley, Inc. v. International Tropic-Cal, Inc.*, 923 F.2d 167, 169 (Fed. Cir. 1991)).

process should not "convert the overall infringement test to an element-by-element comparison."[60]  "[T]he deception that arises is a result of similarities in the overall design, not of similarities in ornamental features considered in isolation."[61]

## B.   Trade Dress Infringement

In order to succeed on a claim of trade dress infringement under Section 43(a) of the Lanham Act, a plaintiff must demonstrate that:  (1) its trade dress has acquired distinctiveness through secondary meaning;[62] (2) there is a likelihood of confusion; and (3) that the trade dress is non-functional.[63]  "[A]

---

[60]   *Richardson*, 597 F.3d at 1295 (citing *Amini*, 439 F.3d at 1372).

[61]   *Amini*, 439 F.3d at 1371.

[62]   To determine whether the trade dress has secondary meaning, the court considers six factors:  "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."  *Cartier Inc. v. Sardell Jewelry, Inc.*, 294 Fed. App'x 615, 617 (2d Cir. 2008).

[63]   *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769–70 (1992); *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 999 (2d Cir. 1997).  "[T]rade dress is functional, and thus not protectable, when it is 'essential to the use or purpose of the article.'"  *Cartier*, 294 Fed. App'x at 620 (quoting *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 116 (2d Cir. 2001)).  Additionally, "[a] product design is functional when 'certain features of the design are essential to effective competition in a particular market.'"  *Id.* (quoting *Landscape Forms, Inc. v. Columbia Cascade Co.*, 70 F.3d 251, 253 (2d Cir. 1995)).  "A utility patent is strong evidence that the features therein claimed are functional."  *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 29 (2001).

probability of confusion, not a mere possibility, must be found to exist" in order to support a finding of trade dress infringement.[64]

"Courts in the Second Circuit look to all of the traditional *Polaroid* factors in analyzing a likelihood of confusion:[65] (1) the strength of plaintiff's mark; (2) the similarity of the parties' marks; (3) the competitive proximity of the products; (4) the likelihood that the plaintiff will bridge the gap between the products; (5) actual customer confusion; (6) defendant's intent or bad faith in adopting the mark; (7) the quality of the defendant's product; and (8) the sophistication of consumers.[66]  None of these factors are dispositive, and the above list is not exhaustive.[67]  "The application of the Polaroid test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their

---

[64]   *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1077 (2d Cir. 1993).  Moreover, regardless of the name given to the infringement claim — false designation of origin, unfair competition, or simply 'infringement' — the question under the Lanham Act and state law infringement claims is the same: is there a likelihood of confusion?  *See Two Pesos, Inc.*, 505 U.S. at 780.

[65]   *Gucci Am., Inc. v. Guess?, Inc.*, — F. Supp. 2d — , No. 09 Civ. 4373, 2012 WL 456519, at *5 (S.D.N.Y. Feb. 14, 2012) (citing *Estée Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1508 (2d Cir. 1997)).

[66]   *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009) (citation omitted) (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)).

[67]   *See Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998).

totality, consumers are likely to be confused.'"[68]

## C.     New York State Unfair Competition

The elements of trademark infringement under New York common law mirror elements of trademark infringement under the Lanham Act.  However, a plaintiff asserting an unfair competition claim under New York common law must also show that the defendant acted in bad faith.[69]  Proof of secondary meaning, however, is not always required.[70]  "[A] plaintiff must show either actual confusion or a likelihood of confusion, and there must be 'some showing of bad faith' on the part of the defendants."[71]

## D.     Priority

A later-filed patent may claim the filing date of an earlier patent, if

---

[68]     *Starbucks Corp.*, 588 F.3d at 115 (quoting *Star Indus. v. Bacardi & Co., Ltd.*, 412 F.3d 373, 384 (2d Cir. 2005)).

[69]     *See Louis Vuitton Malletier v. Warner Bros. Entm't, Inc.*, No. 11 Civ. 9436, 2012 WL 2248593, at *2 n.4 (S.D.N.Y. June 15, 2012) (citations omitted). Bad faith actions may include "palming off, actual deception, appropriation of another's property . . . or deliberate copying." *Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 138 (2d Cir. 1992).

[70]     *See Laureyssens*, 964 F.2d at 139.  *Accord Morex S.p.A. v. Design Inst. of Am., Inc.*, 779 F.2d 799, 801 (2d Cir. 1985).

[71]     *Sly Magazine, LLC v. Weider Publ'ns L.L.C.*, 346 Fed. App'x 721, 723 (2d Cir. 2009) (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34–35 (2d Cir. 1995)).

four statutory requirements are met, pursuit to Section 120 of Title 35 of the United States Code:  (1) "the invention described in the new application must be disclosed . . . in an application previously filed in the United States;"[72] (2) the application must be filed by an inventor or inventors named in the previously filed application; (3) the application must be co-pending with the earlier application, or filed "before the patenting or abandonment of or termination of proceedings on the first application";[73] and (4) the application must contain or be amended to contain a specific reference to the earlier filed application.[74]

## VI.   DISCUSSION

### A.   Material Issues of Fact Exist Regarding Design Patent Infringement

LNC has raised sufficient material issues of fact to preclude a finding of summary judgment in favor of Mayborn.

#### 1.   Claim Construction

Mayborn asks this Court to "ferret out both the functional elements

---

[72]   *Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am.*, Inc., 609 F.3d 1345, 1349–50 (Fed. Cir. 2010) (citation and quotation marks omitted).

[73]   35 U.S.C. § 120.

[74]   *See id.*

and the elements disclosed in the prior art."[75]  This is a difficult endeavor where the patent at issue, the '439 patent, has only one short claim — "the ornamental design for a drinking cup top, as shown and described" — and is comprised of simple drawings.[76]  LNC alleges that Mayborn has copied a number of ornamental features of the '439 patent:  (1) the "racetrack"-shaped spout with two long and two short sides, (2) a circular element on the product's top, (3) the circular element and the spout offset from the center, (4) a concave scoop on the top of the spout, and (5) a transparent lid.[77]  Mayborn counters that each of these elements are either entirely functional or disclosed by the prior art.[78]  The '106 application discloses that the shape of the spout fits comfortably in a child's mouth and that the location of the spout facilitates drinking.[79]  These arguments only demonstrate that these elements of the design of the '439 patent serve some utilitarian purposes.[80]  Nouri

---

[75]   Def. Mem. at 5.

[76]   The '439 Patent at 2–8.

[77]   *See* Pl. Mem. at 6.

[78]   *See* Def. Mem. at 9.

[79]   *See* Def. 56.1 ¶¶ 19, 22.

[80]   *See L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1122 (Fed. Cir. 1993) (citation omitted) ("[T]he design of a useful article is deemed to be functional when the appearance of the claimed design is 'dictated by' the use or purpose of the article . . . .  If the particular design is essential to the use of the article, it can not be the subject of a design patent.") (quoting *Power Controls*

E. Hakim, the inventor of the '439 patent, stated that the spout could have been altered in many ways and the top would have remained effective.[81]  Hakim's deposition suggests that the shape and location of the spout, although serving a functional purpose, may primarily be driven by design considerations.[82]  I find no basis to exclude these elements of the '439 patent based on functionality.[83]

For the other elements highlighted by LNC, Mayborn turns to the prior art, in particular the '061 and the '931 patents for examples of "sloped" transitions between the spout and the base.[84]  Only one example of a transparent top is provided — namely, the '425 patent.  However, that patent discloses a far different overall design than the '439 patent or the TT cup.  Although it has an

---

*Corp. v. Hybrinetics, Inc.*, 806 F.2d 234, 238 (Fed. Cir. 1986)).

[81]      *See* Hakim Dep. at 151–153.

[82]      *See Richardson*, 597 F.3d at 1294 (excluding elements "driven purely by utility" during claim construction).

[83]      *See L.A. Gear*, 988 F.2d at 1123 ("[T]he utility of each of the various elements that comprise the design is not the relevant inquiry with respect to a design patent.  In determining whether a design is primarily functional or primarily ornamental the claimed design is viewed in its entirety, for the ultimate question is not the functional or decorative aspect of each separate feature, but the overall appearance of the article, in determining whether the claimed design is dictated by the utilitarian purpose of the article.") (citing *Lee v. Dayton–Hudson Corp.*, 838 F.2d 1186, 1189 (Fed. Cir. 1988)).  *See also Amini*, 439 F.3d at 1372 ("[D]iscounting of functional elements must not convert the overall infringement test to an element-by-element comparison.").

[84]      *See* Def. Mem. at 7–8.

off-center spout and circular element, the shape of the spout and the cup top are not

similar.  I find that the overall design of the '439 patent was not disclosed by any

of the prior art.  The '439 patent's drawings disclose a specific overall visual look

— a circular transparent top (a rare element in the prior art)[85] combined with a

specifically-shaped, off-center spout opposite a circular element over the valve.[86]

The claim is limited to what is shown in the drawings.[87]

### 2.    Infringement

Mayborn argues that its TT design, which has ridges around the spout

and a star on the off-center circular element creates a sufficient difference between

the overall designs to warrant summary judgment.[88]  Mayborn asserts that other

differences exist:  (1) the '439 patent has a gradual rounded transition to the spout

---

[85]     *See* 3/22/12 Deposition of Cooper C. Woodring ("Cooper Dep."), Ex. 2 to Declaration of Victoria E. Spataro, defendant's counsel, in Further Support of Motion to Dismiss, at 138.

[86]     *See Egyptian Goddess*, 543 F.3d at 680 ("While it may be unwise to attempt a full description of the claimed design, a court may find it helpful to point out, either for a jury or in the case of a bench trial by way of describing the court's own analysis, various features of the claimed design as they relate to the accused design and the prior art.").

[87]     *See In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988) ("Design patents have almost no scope. [They are] limited to what is shown in the application drawings.").

[88]     *See* Def. Mem. at 10.

whereas the TT design has a straight transition; (2) the TT cup's spout has a domed top whereas the '439 patent depicts a spout with a flat top; and (3) the TT cup's spout protrudes from a lower point on the top whereas the '439 patent depicts a spout that merges smoothly into the base of the top.[89]  However, LNC correctly argues that the ordinary observer test asks whether the overall designs are similar.[90] In this case, the overall designs are sufficiently similar that I cannot conclude, as a matter of law, that the TT cup does not infringe the '439 patent.  The shared circular transparent top, the shape and location of the spout, and the circular element opposite the spout are sufficient to support a finding that the TT design could deceive an ordinary observer conversant with the prior art.[91]

### 3.  Priority

Mayborn asserts that the '439 patent claims priority through the '465 patent, —  an intervening patent — that the intervening patent breaks the required chain of continuing disclosure, and that, as a result, the '439 patent cannot claim

---

[89]    See id. at 11.

[90]    See Crocs, 598 F.3d at 1303 (citations omitted) ("The ordinary observer test applies to the patented design in its entirety, as it is claimed. . . . '[M]inor differences between a patented design and an accused article's design cannot, and shall not, prevent a finding of infringement.'") (quoting Litton Sys., Inc. v. Whirlpool, 728 F.2d 1423, 1444 (Fed. Cir. 1984)).

[91]    See Woodring Reports at 10–14.

the '106 application filing date.  Mayborn argues that the '439 patent is therefore

invalid because it was anticipated by the '106 application.[92]  LNC rebuts

Mayborn's assertions with excerpts from the File Wrapper, which lists a claim of

priority directly to the '106 application,[93] and facts satisfying each of the

requirements of 35 U.S.C. § 120.  *First*, drawing all inferences in favor of LNC —

the non-moving party — the '439 patent is sufficiently disclosed by the '106

application.[94]  *Second*, Nouri E. Hakim is undisputedly the common inventor of

both the '106 application and the '439 patent.[95]  *Third*, the '106 patent application

---

[92]    *See* Def. Mem. at 15.

[93]    *See* File Wrapper at 1, 4.  Furthermore, LNC is correct that the '465 patent, the intervening patent, is not at issue in this litigation.  *See* Pl. Mem. at 22.

[94]    *See* the '439 Patent, at 2; the '106 Application, at 2.  Mayborn concedes that the '106 application discloses the elements of the '439 patent, while arguing that the '106 application anticipates the '439 patent.  *See* Def. Mem. at 21–22.  *See also Encyclopaedia Britannica*, 609 F.3d at 1349–50 ("[T]he invention described in the new application must be disclosed . . . in an application previously filed in the United States.") (citation and quotation marks omitted).

[95]    *See* the '439 Patent, at 2; the '106 Application, at 2.  *See also In re NTP, Inc.*, 654 F.3d 1268, 1277 (Fed. Cir. 2011) ("[T]he applications [must have] at least one common inventor.").

was filed.[96]  *Fourth*, the '439 patent contains a reference to the '106 application.[97]

Therefore, contrary to Mayborn's argument,[98] I cannot conclude as a matter of law

that the '439 patent is anticipated by the '106 application.  However, whether the

'439 patent does, in fact, claim priority to the '106 application is a question of fact

for a jury.[99]

## B.   Material Issues of Fact Exist Regarding Trade Dress Infringement

LNC has demonstrated material issues of fact regarding the

infringement of its soft-top trade dress.

### 1.   Secondary Meaning[100]

---

[96]     *See* Pl. 56.1 ¶ 7.  *See also In re NTP, Inc.*, 654 F.3d at 1277 ("[T]he later application [must be] filed before the issuance or abandonment of the earlier filed application.").

[97]     *See* the '439 Patent, at 2.  *See also In re NTP, Inc.*, 654 F.3d at 1277 ("[T]he later application [must contain] a reference to the earlier filed application.")

[98]     *See* Def. Mem. at 21.

[99]     *Encyclopaedia Britannica*, 609 F.3d at 1349 ("'anticipation is a question of fact'") (quoting *Leggett & Platt, Inc. v. VUTEk, Inc.*, 537 F.3d 1349, 1352 (Fed. Cir. 2008)).

[100]    *See Cartier*, 294 Fed. App'x at 617 (holding that the acquisition of secondary meaning is a required element of a trade dress infringement action).  To determine whether the trade dress has secondary meaning, the fact-finder considers six factors:  "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."

### a.    Advertising Expenditures

LNC's Chairman testified that LNC has "spent extensive amounts promoting its products, including, but not limited to the products-in-suit, via advertising allowances to retailers."[101]

### b.    Consumer Studies

LNC has not produced a consumer study.[102]

### c.    Unsolicited Media Coverage

LNC has produced evidence of unsolicited retailer promotions, as well as consumer-created internet sites, comments and fan emails.[103]  In addition to consumer websites,[104] Walmart, Walgreens, and other chains  have promoted

---

*Cartier*, 294 Fed. App'x at 617.

[101]    Hakim Decl. ¶ 18.

[102]    *See Hartco Eng'g, Inc. v. Wang's Int'l, Inc.*, 142 Fed. App'x 455, 460 (Fed. Cir. 2005) ("[Survey evidence] is the most direct and persuasive evidence for establishing secondary meaning."); *20th Century Wear, Inc. v. Sanmark-Stardust, Inc.*, 815 F.2d 8, 10 (2d Cir. 1987) (finding that a consumer survey is helpful given the heavy burden of proving secondary meaning).  *Cf. Bristol-Myers Squibb Co. v. McNeil-P.P.C.*, Inc., 973 F.2d 1033, 1042 (2d Cir. 1992) ("[N]o single factor is determinative.") (quoting *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir. 1979)).

[103]    *See* Pl. Mem. at 16; Hakim Decl. ¶ 24.  *See also* NUBY Emails and Online Stores ("Unsolicited Advertising"), Exs. 1, 2 to Hakim Decl., at 1.

[104]    *See* Hakim Decl. ¶ 14.

LNC's soft-top cups.[105]

### d.    Sales Success

LNC's strongest factor is the commercial success of its NUBY soft-top cups.  The product is sold in "tens of thousands of retail stores" in the United States.[106]  Over 54.5 million products were sold in the U.S. from 2004-2007,[107] a period during which approximately 16.8 million babies were born in the United States.[108]

### e.    Attempts to Plagiarize the Mark

For this factor, LNC relies on the previous infringement suits that have resulted from unauthorized copies of LNC's soft-top cups.[109]

### f.    Length and Exclusivity of the Mark's Use

If LNC experienced a period of exclusive use of the soft-top, this

---

[105]    *See id.* ¶¶ 19–23.

[106]    *See id.* ¶ 12.

[107]    *See id.* ¶ 8.

[108]    *See id.* ¶ 10.

[109]    *See* Pl. Mem. at 19; Hakim Decl. ¶ 26.  *See also Laureyssens*, 964 F.2d at 136 ("[E]vidence that the trade dress or product design was intentionally copied by a competitor can support an inference of secondary meaning."); *20th Century Wear*, 815 F.2d at 10 (holding that "a finding" of intentional copying is persuasive evidence of "consumer recognition and good will").

period was short-lived.  LNC began selling soft-top cups in 2004.[110]  However,

LNC admits that by 2006 at the latest, other companies were selling soft-top cups

"with the very same features that LNC alleges are protectable trade dress."[111]

Overall, LNC has demonstrated evidence of sales success, plagiarism,

and unsolicited media coverage.[112]  The facts presented are sufficient to raise a

material issue of fact as to secondary meaning.[113]

### 2.   Likelihood of Confusion

LNC has raised a material issue of fact regarding the likelihood of

---

[110]    *See* Hakim Decl. ¶ 8.

[111]    Def. 56.1 ¶ 117; Pl. 56.1 ¶ 117.

[112]    Although the Internet postings highlighted by LNC are not traditional media, these emails and NUBY fan sites support the proposition that, "'in the minds of the public, the primary significance of [the trade dress] is to identify the source of the product rather than the product itself.'" *Coach, Inc. v. We Care Trading Co., Inc.*, 67 Fed. App'x 626, 629 (2d Cir. 2002) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n. 11 (1982)).

[113]    *See N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 316 (S.D.N.Y. 2010) (holding that sales success, extensive media coverage, and strong reputation among consumers — largely evidenced by consumer emails — demonstrated secondary meaning).  *See also Kensington Pub. Corp. v. Gutierrez*, No. 05 Civ. 10529, 2009 WL 4277080, at *5 (S.D.N.Y.  Nov. 10, 2009) (finding that evidence of advertising expenditures, customer reviews, fan sites, and actions against alleged infringers precluded a finding of summary judgment for either party); *R.F.M.A.S., Inc. v. Mimi So*, 619 F. Supp. 2d 39, 81–82 (S.D.N.Y. 2009) (finding that considerable sales success combined with media coverage, advertising expenditure, and plagiarism attempts precluded summary judgment).

confusion.

### a.    Strength of the Plaintiff's Mark[114]

This factor weighs in LNC's favor, given the sales success of the LNC soft-top,[115] the consumer reaction to the product,[116] and the support of retailers.[117]

### b.    Similarity of Parties' Marks

I have already found that a material issue of a fact exists as to infringement by Mayborn, and there exists a similar overall look between the two soft-tops.[118] However, the prominence of the NUBY name on the LNC soft-top and the signature star on the TT cups significantly decreases the likelihood of consumer confusion.[119]

---

[114]    *See Bristol-Myers Squibb Co.*, Inc., 973 F.2d at 1044 (citations omitted) ("The strength of a particular mark or dress is measured by its distinctiveness or the degree to which it indicates the source or origin of the product. . . . The strength of a mark should be examined in its commercial context.").

[115]    *See* Hakim Decl. ¶¶ 8–10.

[116]    *See id.* ¶¶ 14–17; Unsolicited Advertising at 1.

[117]    *See* Hakim Decl. ¶¶ 19–23.

[118]    *See supra* Part VI.A.2.

[119]    *See Bristol-Myers Squibb Co.*, Inc., 973 F.2d at 1044 ("The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses.").

### c.    Competitive Proximity[120]

The LNC and TT products serve the same purpose — they are no-spill baby drinking cups.[121]  They also serve the same market and directly compete.[122]

### d.    Bridging the Gap

In this case, where both companies already target the same consumers, there is no gap to bridge.[123]

### e.    Actual Customer Confusion

LNC does not proffer any evidence of actual customer confusion.[124]

### f.    Defendant's Intent or Bad Faith

---

[120]    Competitive proximity is measured by "the nature of the products themselves and the structure of the relevant market."  *Clinique Labs. Inc. v. Dep Corp.*, 945 F. Supp. 547, 553 (S.D.N.Y. 1996).  It must be viewed in light of the first two *Polaroid* factors — that is, as the strength of the senior mark increases, and as the junior mark becomes more similar, the competitive proximity decreases. *See Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).

[121]    *See* the '225 Patent, at 2; Woodring Reports at 1–5.

[122]    *See* 2/2/12 Deposition of Nathan Shamosh, Nuby Senior Vice President, Ex. 12 to Graf Decl., at 92.  *See also Cartier*, 294 Fed. App'x at 619 ("The proximity factor 'focuses on whether the two products compete with each other . . . [,] serve the same purpose, fall within the same general class, or are used together . . . .'") (quoting *Savin Corp. v. Savin Group*, 391 F.3d 439, 458 (2d Cir. 2004)).

[123]    *See Cartier*, 294 Fed. App'x at 619 (finding that there was no bridge to gap where the products competed in the same market).

[124]    *See* Pl. Mem. at 13.

LNC has put forth evidence of bad faith and intent — most notably, that TT's Head of Design "exclaimed that the prototype of the accused product looked 'virtually identical'" to LNC's.[125]  Additionally, according to Mayborn employees, any minor changes made after that time did not change the look of the accused product.[126]  Mayborn had also been a distributor of LNC prior to its loss of distributorship rights,[127] which implies knowledge of the mark.[128]

### g.    Quality of Defendant's Product

There is no indication that Mayborn's product is inferior, and LNC does not discuss this factor.[129]

### h.    Sophistication of Consumers

---

[125]    *See id.* at 5 (quoting 6/23/09 Tina Gray, Mayborn Global Head of Design, Email to Martin Cooke, Head of Tommee Tippee Business Unit and Marketing Department, Ex. 6 to Graf Decl., at 1).

[126]    *See* 7/26/11 Deposition of Ilan Samson, Tommee Tippee Designer ("Samson Dep."), Ex. 7 to Graf Decl., at 289–291.

[127]    *See* Pl. Mem. at 5.

[128]    *See Mobil Oil Corp.*, 818 F.2d at 259 ("[A]ctual or constructive knowledge may signal bad faith.").  *See also Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 583 (2d Cir. 1991) ("[Bad faith] looks to 'whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product.'") (quoting *Edison Bros. Stores, Inc. v. Cosmair*, Inc., 651 F. Supp. 1547, 1560 (S.D.N.Y. 1987)).

[129]    *See* Pl. Mem. at 14.

The sippy cups at issue here are very inexpensive, and LNC asserts that customers do not spend time or effort in purchasing a sippy cup[130] — a proxy argument for asserting that these customers are not sophisticated in the sippy cup market.[131]

Overall, the *Polaroid* factors weigh slightly in LNC's favor — particularly, the strength of the mark, similarity, proximity, defendant's intent, and sophistication of the consumers — and raise material issues of fact regarding a likelihood of confusion that preclude a finding of summary judgment.[132]

### 3.   Non-functionality[133]

---

[130]   *See id.*

[131]   *See Cartier*, 294 Fed. App'x at 620 (finding that Cartier consumers are unlikely to be confused by lower-priced competing products).

[132]   *See Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 219 (2d Cir. 2003) (finding ample evidence of a likelihood of confusion where the parties' products were in direct competition, the plaintiff's trade dress had adequate strength, there was similarity between the marks, there was some evidence of actual confusion, and the consumers of the two products were not highly sophisticated purchasers). *See also U.S. Polo Ass'n, Inc. v. PRL USA Holdings*, Inc., 800 F. Supp. 2d 515, 537 (S.D.N.Y. 2011) (finding a likelihood of confusion based primarily on similarity); *Pita v. Tulcingo Car Service, Inc.*, No. 10 Civ. 0481, 2011 WL 1790833, at *4 (E.D.N.Y. Apr. 6, 2011) (finding a likelihood of confusion where the strength of the mark, bad faith, and similarity factors weighed in the plaintiff's favor).

[133]   *See Two Pesos*, 505 U.S. at 769 ("[E]ligibility for protection under § 43(a) depends on nonfunctionality."). *See also Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995) ("'[A] product feature is functional,'" and

LNC has raised issues of material fact as to the non-functionality of the soft-top design.  Mayborn argues that the description of the embodiments of the '225 patent indicate that the LNC soft-top is functional.[134]  It is appropriate to look to all parts of a utility patent when assessing functionality.[135]  That said, the functional elements disclosed by the '225 patent are individual components of the overall trade dress asserted by LNC — for example, a description of the spout's orientation.[136]  In this case, LNC argues that the soft-top trade dress, on the whole,

---

cannot serve as a trademark, 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article,' that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.") (quoting *Inwood Labs., Inc.*, 456 U.S. at 851 n. 10).

[134]    *See* Def. Mem. at 24.  *See also TrafFix*, 532 U.S. at 29 ("A utility patent is strong evidence that the features therein claimed are functional.").

[135]    *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:89.30 (4th ed. 2012) (citing *In re Bose Corp.*, 772 F.2d 866, 872 (Fed. Cir. 1985).  *See also Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 638 (S.D.N.Y. 2001) (looking to the description of the utility patent to determine the functionality of the relevant trade dress).

[136]    *See* Def. Mem. at 24.  In *TrafFix*, the Supreme Court reasoned that parties might rebut the presumption of functionality where the trade dress protection sought covers ornamental elements of functional forms: "[i]n a case where a manufacturer seeks to protect arbitrary, incidental, or ornamental aspects of features of a product found in the patent claims, such as arbitrary curves in the legs or an ornamental pattern painted on the springs, a different result might obtain. There the manufacturer could perhaps prove that those aspects do not serve a purpose within the terms of the utility patent." *TrafFix*, 532 U.S. at 34.

is not tied to the functional elements described in the '225 patent.[137] There is

enough uncertainty created by the depositions of both Mayborn[138] and LNC

employees[139] — each suggesting that different physical forms could be used

without sacrificing functionality[140] — to preclude summary judgment on

functionality grounds.[141]

### C.    Material Issues of Fact Exist Regarding Unfair Competition

LNC has raised issues of material fact with regard to every element of

a Lanham Act trade dress infringement claim[142] and presented evidence of bad

faith.[143]  As a result, summary judgment is denied on the common law unfair

---

[137]     *See* Pl. Mem. at 26.

[138]     *See* Samson Dep. at 257–258; 6/24/11 Deposition of Nick Cudworth, Mayborn Senior Product Designer, Ex. 10 to Graf Decl., at 126.

[139]     *See* Hakim Dep. at 151–153.

[140]     *See* Pl. Mem. at 26–28.

[141]     *See Cartier*, 294 Fed. App'x at 620 (finding that, although the trade dress performed a function, it was not functional "because there are many alternative designs that could perform the same function").  *See also Best Lock Corp. v. Ilco Unican Corp.*, 94 F.3d 1563, 1566 (Fed. Cir. 1996) ("A design is not dictated solely by its function when alternative designs for the article of manufacture are available.").

[142]     *See supra* Part VI.B.

[143]     *See supra* Part VI.B.2.f.

competition claim.[144]

## VII.   CONCLUSION

For the foregoing reasons, Mayborn's motion for summary judgment is denied. The Clerk of the Court is directed to close this motion (Docket No. 33). A conference is scheduled for August 23, 2012, at 4:30 p.m. in Courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 30, 2012

---

[144]     *See Louis Vuitton Malletier*, 2012 WL 2248593, at *2 n.4 (noting that the standards for Lanham Act section 43(a) claims and common law unfair competition claims are almost the same).   *See also Sly Magazine*, 346 Fed. App'x at 723 ("[A] plaintiff must show either actual confusion or a likelihood of confusion, and there must be 'some showing of bad faith' on the part of the defendants.") (quoting *Jeffrey Milstein*, 58 F.3d at 34–35).

31

**-Appearances-**

**For Plaintiffs:**

Jorge A. Guerrero, Esq.
19 W. 34th St., Apt. 914
New York, New York 10001

Lee A. Goldberg, Esq.
Morris E. Cohen, Esq.
Goldberg Cohen, LLP
1350 Avenue of the Americas, Suite 425
New York, New York 10019
(646) 380-2087

**For Defendant:**

Deepro R. Mukerjee, Esq.
Victoria Elizabeth Spataro, Esq.
Jessica Lynne Supernaw, Esq.
Srilakshmi Madhavi Ravi, Esq.
Alston & Bird, LLP(NYC)
90 Park Avenue
New York, New York 10016
(212) 210-9400/ 9465/ 9572/ 9546

Elizabeth Jordan, Esq.
James C. Grant, Esq.
Alston & Bird LLP
One Atlantic Center, 1201 West Peachtree Street
Atlanta, Georgia 30309
(404) 881-7000